**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 18 B 35437 |
| STEVEN D. ZARLING, | ) | |
| | ) | |
| Debtor. | ) | Chapter 7 |
| | ) | |
| | ) | |
| LINDA NELSON, | ) | |
| | ) | Adv. No. 19 A 1009 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Judge David D. Cleary |
| STEVEN D. ZARLING, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

This matter comes before the court following trial on the complaint filed by Linda Nelson

("Nelson" or "Plaintiff") against Steven Zarling ("Zarling" or "Defendant").  Nelson seeks denial

of Zarling's discharge under 11 U.S.C. §§ 727(a)(2), (a)(3) and (a)(4).  Having heard the

testimony of witnesses, reviewed the exhibits admitted into evidence, and read the briefs

submitted by the parties, the court will enter judgment for Nelson on the count brought under §

727(a)(2) and will enter judgment for Zarling on the counts brought under §§ 727(a)(3) and

(a)(4).

## I.      JURISDICTION

The court has subject matter jurisdiction under 28 U.S.C. § 1334(b) and the district

court's Internal Operating Procedure 15(a). This is a core proceeding under 28 U.S.C. §

157(b)(2)(J). Venue is proper under 28 U.S.C. § 1409(a).

## II.   FINDINGS OF FACT

Steven Zarling lives in Hanover Park with his mother and brother, in a home owned by his mother.  (Tr. Vol. I, pp. 23-26).  He has lived with her in this home on and off since 1996.  (*Id.*, p. 25).  He pays about $300 in monthly rent, sometimes in cash and sometimes in kind by doing repairs around the house.  (*Id.*, p. 26).  Zarling does not pay any of the utility bills except for his own cell phone.  (*Id.*, p. 27).  On Schedule J, he budgeted $370 for rent and $38 for cell phone.  (Pl. Ex. 1).

Linda Nelson lent Zarling money in 2007.  (Tr. Vol. I, p. 27).  Nelson has a judgment against Zarling, entered in 2008 and revived in 2014, in the amount of $32,095.80.  (*Id.*, pp. 27-28 and Case No. 18 B 35437, Claim 2).  Zarling made a few payments and then stopped.  (Tr. Vol. I, pp. 28-29).  Nelson pursued post-judgment enforcement proceedings for ten years, until Zarling filed this bankruptcy case in 2018.  (Complaint and Answer, ¶ 5).  She filed a proof of claim in his bankruptcy case in the amount of $61,671.76.  (Case No. 18 B 35437, Claim 2).

**Zarling receives workers' compensation funds and gives them to his brother Gary**

Around the same time Nelson lent money to him, Zarling suffered a disabling injury at work (he was a drywall taper).  (Tr. Vol. I, p. 29).  Over the years since the injury he has had 13 surgeries, taken several prescription medications and not "one paying job since then."  (*Id.*, lines 8-9 and p. 83).  Zarling pursued a workers' compensation claim for the 2007 injury and received a settlement in February 2018.  (*Id.*, p. 29).  The settlement netted him $39,810.82 (the "Settlement Funds").  (Pl. Ex. 11).  Zarling asked his attorney if the Settlement Funds were "safeguarded against any collections…. I asked specifically if there was – would be any liens by any civil judgments or whatnot, and he said it was – it was protected by – from that."  (Tr. Vol. I., p. 33, lines 5 and 9-12).

At the time Zarling received the Settlement Funds, he believed he could have only $2,000 in his bank account because he receives Social Security. (Tr. Vol. I, p. 31).  Also, he had just injured himself again and was on heavy medication. (*Id.*, pp. 82-83).  So Zarling turned to his brother Gary Zarling ("Gary") for assistance.  Zarling endorsed over the checks representing the Settlement Funds, took about $4,800 for himself in part to hire an attorney to help him obtain a restricted driving permit, and asked Gary to help him manage his daily expenses. (*Id.*, pp. 33-34 and Tr. Vol. II, p. 16).

Zarling admitted in the pleadings that he could not provide a reason for transferring the Settlement Funds to Gary.  (Complaint and Answer, ¶ 42).  At trial, however, he testified differently.

> [T]here was quite a few numerous reasons why I asked my brother to help me manage the monies.  One was, obviously, my medical condition.
>
> Two was, you know, I was – well, I used to have issues with alcohol and drugs years back.  That's, obviously, the prison, imprisonment issue, which I was 13 years of sobriety now.  So, I didn't want to revisit that.  And it's a good thing not having so much money.  I wasn't looking to relapse, or whatnot, having that much money in my possession.
>
> And another was – my intention was to try to repay him some monies, but that never happened because I ended up using some of the monies to regain my driver's license on a limited basis with a restricted driving permit when Illinois changed the law that I became eligible for a restricted driving permit.  So I did accomplish that.

(Tr. Vol. I, p. 32, lines 4-21).  Gary acknowledged that Zarling owed him "thousands over the years.  He still owes me money.  I've never got paid back yet."  (Tr. Vol. II, p. 20, lines 18-19).

Zarling also used some of the Settlement Funds to pay credit card bills that his nephew Jeremy Weiss ("Weiss") had incurred in his name.  "And then he moved off with his girlfriend and stuck me with all that debt, and that's what led me to bankruptcy."  (Tr. Vol. I, p. 35, lines 8-10).  Zarling listed about $50,000 in credit card debt on Schedule F.  (Pl. Ex. 1).

Zarling had gone to prison shortly after Nelson's judgment was entered and remained there until the end of 2012.  (Tr. Vol. I, p. 29).  Zarling felt that he owed Gary money after "years of my DUIs and him bailing me out with attorneys[.]" (*Id.*, p. 36, lines 22-23).  Gary knows nothing about Zarling's finances.  (Tr. Vol. II, pp. 8-12).

**Zarling files this bankruptcy case and various required documents**

Zarling filed for relief under Chapter 7 of the Bankruptcy Code on December 26, 2018. (Case No. 18 B 35437, EOD 1).  He filed his Schedules and Statement of Financial Affairs ("SOFA") the same day.  (Pl. Ex. 1).  According to the Schedules, Zarling's only sources of income are the government benefit programs Social Security, Supplemental Nutrition Assistance Program ("SNAP") and Aid to the Aged, Blind and Disabled ("AABD").  (*Id.*).

When asked on Schedule I, line 8c to disclose "[f]amily support payments that you . . . regularly receive," Zarling wrote $0.  (*Id.*).  No contributions from family are listed in answer to Question 5 on his SOFA, which requires disclosure of income received during the year of filing or the two previous calendar years.  (*Id.*).

Zarling checked "no" when asked at Question 33 of Schedule B whether he held any claims against third parties.  (*Id.*).  When asked at trial why he did not disclose the workers' compensation claim, he first answered, "I don't know." (Tr. Vol. I, p. 55, line 10).  Zarling then testified that when he met with his bankruptcy attorney, he brought "a copy of my workmen's comp, what do you call it, the – agreement or whatever.  And I also put in – I'm sorry.  I'm drawing a blank – I'm sorry – the contract for the workmen's comp settlement….  I'm stating it for the record, I did put both of those in with my packet, and somehow that did not get included for some reason."  (*Id.*, p. 55, lines 18-22 and p. 56, lines 5-8).

In his original SOFA, Zarling did not disclose the transfer of the Settlement Funds to his brother Gary.  In answer to Question 8, which asks whether he made any payments or transferred any property on account of a debt that benefited an insider within one year before filing for protection under the Bankruptcy Code, Zarling answered "no."  (Pl. Ex. 1).  Zarling gave the same answer to Question 18 ("Within 2 years before you filed for bankruptcy, did you . . . transfer any property to anyone, other than property transferred in the ordinary course of your business or financial affairs?").  (*Id.*).

Zarling explained that "in my eyes it wasn't really a transfer.  He [Gary] managed the money because I couldn't do anything myself because of my injury."  (Tr. Vol. I, p. 59, lines 11-14).

Trustee Richard Mason held Zarling's meeting of creditors on January 29, 2019.  (Joint Pretrial Statement, ¶ 11).   Mason questioned Zarling about the Settlement Funds and asked him to amend the Schedules to disclose this asset.  (Tr. Vol. I, pp. 65-66).

Zarling filed amended Schedules about a week later, disclosing his workers' compensation claim and receipt of the Settlement Funds. (Pl. Ex. 2).  He also filed an amended SOFA, disclosing a transfer of the Settlement Funds to an individual described as his brother, George Zarling.  (Pl. Ex. 3).  Zarling testified that this was a typo that he brought to his attorney's attention.  He does not have a brother named George.  (Tr. Vol. I, p. 69).  When asked whether he intended to amend his SOFA, Zarling responded: "I thought it was already taken care of."  (*Id.*, p. 70, line 5).

In response to a subpoena he received from Nelson during this case, Zarling provided her with documents disclosing the Settlement Funds and other income.  (*Id.*, p. 86).

**During the year prior to filing for relief under the Bankruptcy Code, Zarling received deposits from several sources**

Zarling's bank account statements reflect certain deposits totaling $8,965.71 during the year prior to the bankruptcy filing ("Miscellaneous Income").  (Pl. Ex. 12).

| Date | Amount | Date | Amount |
|---|---|---|---|
| 12/28/2017 | $300.00 | 7/9/2018 | $1,000.00 |
| 1/29/2018 | $400.00 | 8/1/2018 | $445.00 |
| 2/5/2018 | $420.66 | 8/30/2018 | $220.00 |
| 3/1/2018 | $450.00 | 10/1/2018 | $470.00 |
| 3/22/2018 | $2,000.00 | 10/18/2018 | $500.05 |
| 4/25/2018 | $1,460.00 | 11/30/2018 | $500.00 |
| 6/15/2018 | $400.00 | 12/13/2018 | $400.00 |

According to Zarling, there were three sources for the Miscellaneous Income.  Before February 2018, the money came from his nephew, Weiss.  "He's the one who I allowed to use my credit cards for the lawyers, and then for car repairs and stuff.  And he was giving me money out of his checks.  Then he took off with his girlfriend down to southern Illinois and left me with the -- holding on to all the payments."  (Tr. Vol. I, p. 73, lines 15-20).  Zarling estimated that Weiss owes him around $16,000.  (*Id.*, p. 74).

The Miscellaneous Income also included a "couple of checks from Cook County – Cook County jail, what do you call them?  Lawsuits, class action lawsuits….  There was like two or – two or three of them in the past two years that I collected on."  (*Id.*, p. 75, lines 6-8 and 10-11). The deposit on February 5, 2018 in the amount of $420.66 represents one of those checks.  (*Id.*, p. 75).  Zarling did not disclose any class action distributions on his Schedules and SOFA.  (*Id.*).

To explain why, Zarling first stated that he "may have forgotten about that one" and then that "I didn't think that would be something that needed to be marked down." (*Id.*, p. 75, lines 24-25 and p. 76, lines 17-18).

Finally, after Zarling received the Settlement Funds in February 2018, "a majority of my deposits in that year I would have – I was taking – I was asking my brother for monies out of the settlement monies so as to cover all of the credit card payments." (*Id.*, p. 72, lines 13-17).

Gary acknowledged that he gave Zarling money from the Settlement Funds. In fact, by the time Gary testified at trial, he had transferred all the money back to Zarling and was "still giving him money to this day even though his money is exhausted." (Tr. Vol. II, p. 21, line 25 – p. 22, line 1). If Zarling needs money, Gary gives it to him, just as he "help[s] out all my family members." (*Id.*, p. 25, line 24).

While Zarling attributed some of the Miscellaneous Income deposits to his brother, Gary insisted that all his transfers to Zarling were made in cash.

> Q:    Did you give it to him in cash?
>
> A:    Yes.
>
> Q:    So you took out a particular amount out of your account and just handed him dollar bills?
>
> A:    Correct.
>
> Q:    In what denominations? Do you have a recollection? That's a lot of money to have been exhausted in –
>
> A:    I don't – I have no idea. Well, I would assume the cash station, which only gives out 20s. Sometimes I would get it from the teller.

(*Id.*, p. 22, lines 17-25 – p. 23, lines 1-2). Gary also paid some of Zarling's food and attorney expenses on his behalf. (*Id.*, pp. 34-36).

Zarling did not disclose these deposits as income in his Schedules and Statement of Financial Affairs because he believed they were not income. "[T]he money came out of the workmen's comp settlement which was already declared." (Tr. Vol. I, p. 77, lines 21-22).

There is no written agreement between Zarling and his brother or between Zarling and Weiss regarding amounts owed and repaid. (*Id.*, p. 78). When asked whether there was any documentation of the money Zarling owed him, Gary answered, "No. I don't ask my family for a writing. I usually just – you know, it's just – it's family." (Tr. Vol. II, p. 20, lines 21-22).

## III.   CONCLUSIONS OF LAW

Nelson asks the court to deny Zarling's discharge on three grounds: 11 U.S.C. §§ 727(a)(2), (a)(3), and (a)(4). The court will consider each of these statutory provisions in turn.

Objections to discharge are construed strictly against the objecting creditor and liberally in favor of the debtor. *See In re Kontrick*, 295 F.3d 724, 736 (7th Cir. 2002), *aff'd sub nom. Kontrick v. Ryan*, 540 U.S. 443 (2004). According to the Federal Rules of Bankruptcy Procedure, "[a]t the trial on a complaint objecting to a discharge, the plaintiff has the burden of proving the objection." Fed. R. Bankr. P. 4005. The objecting creditor must establish grounds for denial of discharge by a preponderance of the evidence. *In re Scott*, 172 F.3d 959, 966-67 (7th Cir. 1999). Denial of discharge is a drastic remedy reserved only for the worst actors. *See, e.g., Stathopoulos v. Bostrom*, 286 B.R. 352, 359 (Bankr. N.D. Ill. 2002), *aff'd*, 2003 WL 403138 (N.D. Ill. Feb. 20, 2003).

### A. Zarling's discharge will be denied under 11 U.S.C. § 727(a)(2)

Nelson first seeks denial of Zarling's discharge under 11 U.S.C. § 727(a)(2)(A). Pursuant to this subsection:

(a) The court shall grant the debtor a discharge, unless--…

8

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed--

(A) property of the debtor, within one year before the date of the filing of the petition[.]

To prevail on her claim under § 727(a)(2)(A), Nelson must prove four elements by a preponderance of the evidence.

(1) that the act complained of was done at a time subsequent to one year before the date of the filing of the petition;

(2) with actual intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under the Bankruptcy Code;

(3) that the act was that of the debtor or his duly authorized agent;

(4) that the act consisted of transferring, removing, destroying or concealing any of the debtor's property, or permitting any of these acts to be done.

*Matter of Agnew*, 818 F.2d 1284, 1287 (7th Cir. 1987) (citation omitted).

The acts that form the basis of Nelson's claim under § 727(a)(2)(A) are: (1) Zarling's failure to disclose the Settlement Funds in his original bankruptcy papers; (2) transferring the Settlement Funds to Gary; (3) paying up to $16,000 to Weiss without listing this claim on his Schedules; and (4) concealing his participation in and distributions from the class action lawsuits. (Plaintiff's Post-Trial Brief, p. 5).

The first element of § 727(a)(2)(A) is that the act must have taken place within one year before the date of the filing of the petition. Zarling transferred the Settlement Funds to Gary in February 2018, about 10 months before filing for relief under the Bankruptcy Code. The other acts took place at the filing of the petition. Therefore, there is no dispute that *Agnew's* first requirement is satisfied. Neither is there any issue regarding the third requirement, that the act was that of the debtor or his duly authorized agent. Zarling received the Settlement Funds and transferred them to Gary. Zarling signed his Schedules and Statement of Financial Affairs.

9

*Agnew's* fourth requirement is "that the act consisted of transferring, removing, destroying or concealing any of the debtor's property, or permitting any of these acts to be done." The transfer to Gary easily satisfies this requirement. Zarling admits that the Settlement Funds were his property and that he made the transfer. The other three acts, however, involve Zarling's omissions from his Schedules and Statement of Financial Affairs. Omissions on verified schedules and other bankruptcy papers are usually the subject of a claim under § 727(a)(4). In fact, the court will discuss these omissions in the § 727(a)(4) section later in this opinion.

Several courts, however, have found that "[o]mission of property from verified schedules may be both a false oath [under § 727(a)(4)] and a concealment [under § 727(a)(2)]." *In re Jayme*, 2018 WL 3218104, *12 (Bankr. D.N.M. June 29, 2018) (quotation omitted) (string citations omitted), *aff'd*, 2020 WL 1181713 (D.N.M. Mar. 12, 2020). *See In re Ridley*, 2017 WL 1906589, *3 (Bankr. D. Wyo. May 9, 2017) ("The discharge exceptions for asset concealment under § 727(a)(2) and false oath under § 727(a)(4) usually go hand in hand because a debtor who fraudulently conceals assets in the petition has also necessarily made a false oath by signing the petition.").[1]

When analyzed under § 727(a)(2), concealment consists of "failing or refusing to divulge information to which creditors were entitled." *In re Mosher*, 417 B.R. 772, 784 (Bankr. N.D. Ill. 2009) (quotation omitted). *See In re Schryver*, 558 B.R. 856, 875 (Bankr. N.D. Ill. 2016) (deliberately withholding information about assets from the schedules can constitute concealment). Zarling failed to divulge information about the Settlement Funds, his claim

---

[1] *But see In re Allen*, 553 B.R. 916, 922 (Bankr. M.D. Fla. 2016) ("The Court is of the opinion that claims that a debtor fraudulently undervalued assets, fraudulently failed to disclose pre-petition transfers, or fraudulently failed to schedule assets should be raised under § 727(a)(4).").

against Weiss and the class action distributions, so *Agnew's* fourth element is also present for these acts.

The most difficult question is whether Nelson proved *Agnew's* second element by a preponderance of the evidence – that Zarling acted with actual intent to hinder, delay, or defraud. "Intent to defraud" must be actual and not constructive. Zarling does not admit to actual fraud. He argues in his post-trial brief that he "provided honest and open testimony at his § 341 Meeting of Creditors, Rule 2004 Examination [and] testimony at trial." (Defendant's Post-Trial Brief, p. 3).

The Seventh Circuit recognized that "because it is unlikely that the debtor will admit fraud, intent may be established by circumstantial evidence." *Village of San Jose v. McWilliams*, 284 F.3d 785, 790 (7th Cir. 2002) (citations omitted). In *McWilliams*, the Circuit provided lower courts with several factors which indicate actual fraud if established by the plaintiff.

> (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry.

*Id.* at 791 (quotation omitted). If Nelson shows that one or more of the factors are present, "this creates a presumption of an intent to defraud establishing [her] prima facie case and shifting ... the burden to [Zarling] of demonstrating that he lacked fraudulent intent." *Id.* (quotation omitted). The Federal Rules of Evidence provide that Zarling "has the burden of producing evidence to rebut the presumption." FRE 301. *See Emerging Vision v. Sundstrom*, 2008 WL 509530, *4 (E.D. Wis. Feb. 25, 2008) (the debtor-defendant must "rebut, or negate, the presumption.").

11

Nearly all the "badges of fraud" described in *McWilliams* are present regarding the transfer of the Settlement Funds.  First, Zarling transferred the Settlement Funds to Gary with no contemporaneous consideration.  Gary testified that over the years, he had spent thousands of dollars helping Zarling, but there was no evidence of any agreement between the brothers that these funds should be repaid.  In fact, after Zarling admitted in his Answer that he had no explanation for the transfer, the court heard several contradictory reasons at trial, including repayment of these alleged loans, Zarling's medical condition and past issues with substance abuse.  More troubling is Zarling's testimony that upon receipt of the Settlement Funds, he: (1) inquired whether creditors could seize the funds; and (2) believed that because he receives Social Security, there is a restriction on the amount of money he can keep in a bank account.  This suggests that by giving the checks to Gary, Zarling intended to defraud both his creditors and the federal government.  In any event, there was no contemporaneous consideration.

The second badge of fraud is the relationship between the parties.  This element is clearly met – Gary is Zarling's brother.  The facts also suggest the presence of the third badge of fraud. While Zarling did not retain possession of the Settlement Funds, he benefitted from them.  Gary consistently gave him money throughout 2018.  Moreover, Zarling testified that he "ended up using some of the monies to regain my driver's license on a limited basis with a restricted driving permit when Illinois changed the law that I became eligible for a restricted driving permit."

Nelson also demonstrated the existence of the fifth badge of fraud, the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors.  She spent ten years pursuing post-judgment enforcement proceedings.  Nelson met with little success, as

12

evidenced by the fact that her $32,095.80 judgment had grown with interest to $61,671.76 by the time Zarling filed this bankruptcy case. Meanwhile, after transferring a large lump sum to his brother, Zarling took back those funds in cash over several months and gave money to his nephew for no consideration, all while Nelson sought enforcement of her judgment.

Finally, the general chronology of the events and transactions under inquiry supports a finding that Nelson has established the existence of the sixth badge of fraud. Zarling had to wait over ten years after his injury to receive his workers' compensation settlement. All this time, Nelson pursued her judgment against him, even reviving the judgment in 2014. Rather than making even a de minimis payment toward her debt, Zarling gave nearly all the money to his brother. He kept $4,800 back, using some of it to pay for an attorney so he could obtain a restricted driving permit.

Since Nelson proved by a preponderance of the evidence that five of the six badges of fraud are present, she created a presumption of an intent to defraud and shifted the burden to Zarling to demonstrate that he lacked fraudulent intent. He did not come forward with sufficient evidence to do so. *See McWilliams*, 284 F.3d at 791 (after the presumption arises, the debtor-defendant must demonstrate that he lacked fraudulent intent); *Matter of Chastant*, 873 F.2d 89, 91 (5th Cir. 1989) (debtor-defendant did not rebut the presumption that he transferred property with actual fraudulent intent). *See also Tavenner v. Smoot*, 257 F.3d 401, 408 (4th Cir. 2001) (when analyzed under 11 U.S.C. § 548(a)(1)(A), transfers between related parties, if made without adequate consideration, create a presumption of actual fraudulent intent which "establishes the [plaintiff's] prima facie case and shifts the burden of proof to the debtor to establish the *absence* of fraudulent intent") (citation omitted); *In re Powers*, 1992 WL 352557, *3 (5th Cir. Nov. 18, 1992) (unpublished per curiam opinion) (once plaintiff established his

13

prima facie case under § 727(a)(2)(A), this "shifted the burden to [debtor-defendant] of establishing that he lacked fraudulent intent…. [T]he Bankruptcy Code requires this shift in the burden of proof.") (citations omitted).

Nelson obtained a judgment against Zarling in 2008 and pursued enforcement actions against him for ten years. No other judgment creditors are listed in Zarling's Schedules, and Nelson's debt is one of if not the oldest claim that Zarling scheduled. Nevertheless, upon receiving the Settlement Funds in February 2018, Zarling gave his brother approximately $35,000 and kept $4,800 for himself to spend at least in part on an attorney. Plaintiff's Exhibit 12 is a group exhibit of Zarling's bank statements between July 2017 and June 2019. The evidence shows that only on a handful of days did Zarling's balance exceed $2,000 or even $1,000. Receipt of over $39,000 in workers' compensation proceeds stemming from an injury suffered more than ten years earlier, and during a time in which he was severely injured and had not been employed, would have been a major event. Safeguarding the Settlement Funds with a relative for use as needed would be a logical goal consistent with the presumption of intent, especially with a judgment creditor pursuing enforcement of her claim. Even if the funds were not subject to attachment by creditors, transferring to his brother further insulated the Settlement Funds from discovery by Nelson and other creditors. Zarling's statement regarding the legal status of the Settlement Funds does not demonstrate that he lacked an intent to defraud. *See Matter of Smiley*, 864 F.2d 562, 569 (7th Cir. 1989) ("[A] fair reading of the statute makes it clear that so long as there is an *intent* to hinder, delay, or defraud, in combination with an act such as a transfer, then a debtor should be denied the privilege of discharge. The statute does not provide that the creditors must have, in fact, been hindered, delayed or defrauded.").

14

Zarling's explanations for the transfer do not satisfy *McWilliams'* requirement that he demonstrate a lack of fraudulent intent. He first admitted in his Answer that he did not have a reason for the transfer. Then, when asked at trial why he did not disclose the workers' compensation claim in his bankruptcy papers, Zarling did not know. Finally, he pivoted when pressed to establish a justification for his actions and to negate the presumption that he acted with intent to defraud. Zarling offered reasons that are not consistent with his past behavior and that occurred only when he received a large sum of money while Nelson pursued her post-judgment enforcement actions.

Since Zarling did not come forward with sufficient evidence to rebut the presumption established by the presence of five badges of fraud, the court concludes that he transferred the Settlement Funds to Gary with actual intent to hinder, delay, or defraud Nelson.

The same cannot be said for Zarling's failure to disclose the Settlement Funds on his Schedules. His case trustee questioned Zarling about the Settlement Funds and asked him to amend his papers to disclose this asset. He filed amended Schedules about a week later, disclosing his workers' compensation claim and receipt of the Settlement Funds. Although amending bankruptcy papers "cannot expunge the falsity of an oath…. subsequent disclosures are evidence of innocent intent." *In re Bailey*, 147 B.R. 157, 165 (Bankr. N.D. Ill. 1992) (citations omitted).

Neither has Nelson proved by a preponderance of the evidence that Zarling acted with intent to defraud when he failed to list his claim against Weiss. Although Weiss's status as a family member is a badge of fraud, and the Code requires disclosure of all assets, Zarling had no agreement with Weiss that the money Zarling gave him would be repaid. Even if there were an expectation of payment, Zarling's testimony suggests that he had given up on it: "And then he

15

moved off with his girlfriend and stuck me with all that debt, and that's what led me to bankruptcy." Based on the evidence, the court finds it likely that it did not even occur to Zarling that he should disclose a claim against Weiss on Schedule B.

Finally, the failure to disclose the class action distributions does not suggest an intent to defraud. Nelson established that one deposit in the amount of $420.66, made more than ten months before the bankruptcy filing, was a distribution from a class action lawsuit. At first Zarling testified that he forgot about the money, then he stated that he "didn't think that would be something that needed to be marked down." Although conflicting testimony could suggest an intent to defraud, under these circumstances it does not. Having observed Zarling's demeanor, the court finds it credible that he could not recall his decision-making process nearly two years earlier on this single, de minimis point.

While Zarling's failures to disclose the Settlement Funds, the claim against Weiss and the class action distributions do not support a claim for concealment under § 727(a)(2), the court finds that Nelson proved by a preponderance of the evidence that the four requirements of § 727(a)(2) were present when Zarling transferred the Settlement Funds to Gary. Judgment will be entered for Nelson on this count.

## B. Zarling's discharge will not be denied under § 727(a)(3)

Pursuant to 11 U.S.C. § 727(a)(3):

(a) The court shall grant the debtor a discharge, unless--

> (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case[.]

Debtors must produce records that provide creditors "with enough information to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and

16

accuracy for a reasonable period past to present." *In re Juzwiak*, 89 F.3d 424, 427 (7th Cir. 1996) (quotation omitted).

Nelson argues that courts and creditors should not be required to reconstruct a debtor's financial affairs. (Plaintiff's Post-Trial Brief, p. 7). It is the debtor's duty to maintain and preserve financial records. *In re Fink*, 351 B.R. 511, 522 (Bankr. N.D. Ill. 2006).

This is accurate, as far as it goes, but it is not a complete statement of the law. While the Seventh Circuit has instructed lower courts that the language of § 727(a)(3) "places an affirmative duty on the debtor to create books and records accurately documenting his business affairs," *Scott*, 172 F.3d at 969 (citation omitted), it gave that instruction in the context of a complicated case that spent years in Chapter 11. In contrast, "most bankruptcies are consumer-type bankruptcies with no assets or business affairs to speak of, and, therefore, the complexity of their business transactions do not implicate § 727(a)(3)." *Id.* at 970. The statute itself provides an exception where a debtor's "act or failure to act was justified under all of the circumstances of the case."

Nelson argues that Zarling's discharge should be denied because he failed to create, maintain and produce records relating to $39,810.83 in workers' compensation checks, $8,965.71 in Miscellaneous Income, including distributions received from class action lawsuits, and $16,000 transferred to Weiss. (Plaintiff's Post-Trial Brief, p. 8).

### 1. Worker's compensation checks / Settlement Funds

Nelson contends that Zarling only produced documents about the Settlement Funds after their existence was discovered by the Trustee. He produced no documents about how or by whom the Settlement Funds were spent. As a result, it is impossible for her or the court to ascertain Zarling's true financial condition. (*Id.*).

However, Zarling was not required to produce documentation about the Settlement Funds until it was requested from him.  As the court wrote in its Order Denying Plaintiff's Motion for Judgment on the Pleadings ("JOTP Order"), "11 U.S.C. § 521(a) required Steven [Zarling] to file a schedule of assets and liabilities and a schedule of current income and current expenditures. The Code does not require production of supporting records unless and until a case trustee or creditor requests them…".  (JOTP Order, p. 7).  In response to a subpoena, Zarling produced copies of the Settlement Funds checks, and a deposit slip indicating that Gary deposited the Settlement Funds in his own account.

Having heard directly from Zarling and Gary, and considered the evidence provided regarding Zarling's medical condition and ability to manage his finances, the court concludes that the failure to keep additional records beyond the check copies and the deposit slip was "justified under all of the circumstances of the case."

## 2.  Miscellaneous Income and claim against Jeremy Weiss

Nelson contends that Zarling's discharge should be denied under § 727(a)(3) because he failed to keep or preserve any recorded information, including books, documents, records, and papers, relating to the Miscellaneous Income.  She argues that he disclosed no source of income other than Social Security, SNAP and AABD in his Schedules and Statement of Financial Affairs, but that his bank statements revealed receipt of $8,965.71 in deposits of varying amounts during the year prior to filing for relief under the Bankruptcy Code.  Zarling testified at trial that some of the deposits were from Weiss, some from class action distributions, and the rest were transfers by Gary from the Settlement Funds.

Nelson further asserts that denial of discharge under § 727(a)(3) is appropriate because Zarling did not keep or preserve records relating to his $16,000 claim against Weiss.  She

contends that Zarling's failure to produce records relating to Weiss's $16,000 debt and the class action distributions make it impossible for the court to ascertain his true financial condition.

The Seventh Circuit reminds us, however, that "most bankruptcies are consumer-type bankruptcies with no assets or business affairs to speak of, and, therefore, the complexity of their business transactions do not implicate § 727(a)(3)." *Scott*, 172 F.3d at 970.

It might have been helpful if Zarling kept a ledger in which he recorded each transfer from Gary or repayment from his nephew, or a checkbook in which every deposit was noted with a description of the payor.

While those records would have been useful, they do not exist.  In response to Nelson's discovery requests, Zarling produced his bank statements.  Having listened to Zarling's testimony and observed his demeanor at trial, the court has no doubt that the bank statements are the full extent of the available records, and that the failure to do more is justified under all of the circumstances of this case.

Zarling was a drywall taper until he suffered the injury that resulted in the workers' compensation proceeding.  He has lived with his mother in their current home on and off since 1996.  Zarling gives his mother about $300 in rent each month, sometimes in cash and sometimes in kind.  He pays no utility bills except for his cell phone.

Since being injured at work in 2007, Zarling has not been employed and has been on prescription medication.  He survives on Social Security, SNAP and AABD benefits, with sporadic family contributions.

This is exactly the "consumer-type bankruptc[y] with no assets or business affairs to speak of" to which the Seventh Circuit referred in *Scott*.  Since the statute provides an exception to the requirement that financial records be kept, the Circuit concluded that the complexity of the

19

transactions in those consumer-type bankruptcies do not implicate § 727(a)(3). The facts of this case dictate that this court should follow that conclusion.

For all these reasons, the court finds Nelson has not established by a preponderance of the evidence that Zarling's discharge should be denied under § 727(a)(3). Judgment will be entered for Zarling on this count.

### C. Zarling's discharge will not be denied under 727(a)(4)

Pursuant to 11 U.S.C. § 727(a)(4), "[t]he court shall grant the debtor a discharge, unless – … (4) the debtor knowingly and fraudulently, in or in connection with the case – (A) made a false oath or account[.]"

In order "to prevail on a claim under this subsection, the [plaintiff] must prove by a preponderance of the evidence that: (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case." *Stamat v. Neary*, 635 F.3d 974, 978 (7th Cir. 2011) (string citations omitted). The court will review each of the elements of this cause of action.

### 1. Zarling made statements under oath

"A debtor's petition, schedules, statement of financial affairs, statements made at an 11 U.S.C. § 341 meeting, and answers to interrogatories all constitute statements under oath for purposes of § 727(a)(4)." *Fiala v. Lindemann*, 375 B.R. 450, 469 (Bankr. N.D. Ill. 2007) (citations omitted). The following statements or omissions under oath are at issue in this case:

■ Zarling wrote $0 on line 8c of Schedule I, which asks debtors to disclose "[f]amily support payments that you . . . regularly receive[.]"

20

■ Zarling did not disclose any contributions from family in response to Question 5 on his SOFA, which requires disclosure of income received during the year of filing or the two previous calendar years.  Neither did Zarling disclose payments from Weiss or the class action distributions in response to this question.

■ Zarling checked "no" when asked at Question 33 of Schedule B whether he held any claims against third parties.  Zarling filed amended Schedules about a week after his meeting of creditors, disclosing his workers' compensation cause of action and receipt of the Settlement Funds, but he never disclosed a claim against Weiss.

■ In answer to Question 8 on his SOFA, which asks whether he made any payments or transferred any property on account of a debt that benefited an insider within one year before filing for protection under the Bankruptcy Code, Zarling answered "no."  Zarling gave the same answer to Question 18 on his SOFA ("Within 2 years before you filed for bankruptcy, did you . . . transfer any property to anyone, other than property transferred in the ordinary course of your business or financial affairs?").

■ Zarling filed an amended SOFA.  In answer to Question 18, he disclosed a transfer of the Settlement Funds to an individual described as his brother, George Zarling.

**2.  All the statements listed above were false**

The first two statements in the list above concern disclosure of family contributions, whether regular contributions or those received during the nearly three years prior to filing the bankruptcy case.  Zarling had two opportunities to disclose family contributions, but he did not take either one.  Zarling acknowledged at trial that Gary had given him money over the years; this was one of the reasons Zarling gave for transferring the Settlement Funds to him.  Gary agreed, testifying that Zarling owed him "thousands over the years."  Despite that, Gary was

21

"still giving him money to this day even though his money is exhausted." The evidence showed that if Zarling needs money, Gary gives it to him.

The second omission also encompasses Zarling's failure to disclose the class action distributions as income received during the period prior to filing for relief under the Bankruptcy Code. In asking for disclosure of income, Question 5 describes a non-exclusive list of "other income" which includes "money collected from lawsuits." By omitting the class action distributions from this answer, Zarling made a false oath.

On his original Schedule B, Zarling did not disclose the existence of his workers' compensation claim and the funds received. Although he filed an amended Schedule B shortly after his meeting of creditors, the fact remains that the original contained a false oath. Also, neither the original nor the amended Schedule B disclosed the claim against Weiss.

In his Statement of Financial Affairs Zarling had two opportunities to disclose the transfer of the Settlement Funds. In his original SOFA, he took neither one. Disclosing the transfer in response to Question 8 would have been appropriate if, as Zarling testified, he gave the money to Gary because his brother had lent him so much money over the years. If the transfer was not meant to be a repayment of debt, then its disclosure would have been appropriate in response to Question 18. Failure to answer one of those questions in the affirmative was a false oath. Filing an amended Statement of Financial Affairs may speak to Zarling's intent, but it did not cure the false oath in the original. Moreover, when he finally disclosed the transfer in the amended SOFA, Zarling stated that the transfer was to his brother, George. Zarling does not have a brother named George, so that was a false oath as well.

### 3. Zarling knew some of the statements were false

Family contributions.  Zarling had to know his failure to disclose Gary's contributions, both on Schedule I and in his SOFA, was a false oath.  The testimony shows that Gary gave Zarling money whenever he asked for it.

Class action distributions.  Nelson did not prove by a preponderance of the evidence that Zarling knew he was making a false statement when he failed to disclose the class action distributions.  He received two or three checks totaling several hundred dollars over two years.  Based on the evidence adduced at trial, the court concludes it is far more likely that Zarling forgot about the class action payments.

The workers' compensation claim.  Zarling provided credible testimony that he did not know he was making a false oath when he failed to disclose the existence of the workers' compensation claim on his original Schedule B.  He testified that he gave the relevant paperwork to his attorney: "I did put both of those in with my packet, and somehow that did not get included for some reason."  The court heard no contradictory evidence from Zarling's attorney.

Debtors sign their Schedules and Statement of Financial Affairs under oath, and Zarling had the responsibility to review those papers before filing.  Nevertheless, having observed Zarling's demeanor and testimony, the court is not persuaded that he knew the claim was omitted.

Claim against Jeremy Weiss.  Neither does the evidence support the conclusion that Zarling knew he was omitting the $16,000 claim against Weiss.  Based on Zarling's testimony, it appears to the court that Zarling was more focused on what he did for his nephew and the fact that Weiss ran up large bills on his credit card, which "led [him] to bankruptcy."  Nelson did not

prove by a preponderance of the evidence that Zarling understood he had a claim against his nephew, and that he knew this claim should be disclosed in the bankruptcy case.

Transfer of the Settlement Funds.  Zarling testified that in his opinion, signing the Settlement Funds over to Gary "wasn't really a transfer."  Having had the opportunity to observe Zarling on the stand, the court finds his testimony to be credible.  Zarling received all the funds back in irregular payments during the ten months between receipt in February and filing for bankruptcy relief in December 2018.  Nelson did not prove by a preponderance of the evidence that Zarling knew he was making a false oath when he omitted the transfer of the Settlement Funds from his bankruptcy papers.

This finding is not inconsistent with the court's earlier conclusion that the transfer itself was done with intent to defraud.  Signing the checks over to Gary and then receiving the money back in cash over a ten-month period is not equivalent to failing to realize that the transfer should have been disclosed in bankruptcy papers.

Transfer to George Zarling.  Zarling characterized the disclosure of "George" Zarling as the recipient of the transfer as a typo.  He knew that it was false because he saw it and brought it to his attorney's attention.

### 4. Zarling did not make the remaining statements with fraudulent intent

The remaining statements, which were false and which Zarling knew were false, are: (1) failure to disclose Gary's contributions as income; and (2) describing the Settlement Funds transfer as going to George Zarling instead of to Gary.  The fourth element of § 727(a)(4) asks whether Zarling made those statements with fraudulent intent.

"Intent to defraud involves a material representation that you know to be false, or, what amounts to the same thing, an omission that you know will create an erroneous impression." *In*

24

*re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998) (citations omitted). A reckless disregard for the truth is sufficient to prove fraudulent intent. *Stamat*, 635 F.3d at 982.

Having observed Zarling's demeanor and testimony, the court is not persuaded that he omitted Gary's contributions or that he used the name "George" instead of "Gary" with fraudulent intent.  The evidence showed that Zarling has not held a job for more than 13 years. He lives in his mother's house and pays her a small amount in rent, for which he sometimes substitutes in kind work.  He pays only one utility bill, for his cell phone.  The evidence supports the conclusion that Zarling is not financially sophisticated.

The court has no direct evidence as to what transpired at Zarling's meeting of creditors, but we know that Zarling was quick to amend his papers when his case trustee requested it.  *See In re O'Neill*, 468 B.R. 308, 332 (Bankr. N.D. Ill. 2012) ("A debtor who mistakenly or inadvertently provides false information or fails to disclose pertinent information and takes steps to amend his filings to correct them prior to conclusion of the Meeting of Creditors does not possess the requisite fraudulent intent to deny discharge under § 727(a)(4)(A).") (footnote omitted).

Finally, the court is mindful that objections to discharge are construed strictly against the objecting creditor and liberally in favor of the debtor.  *Kontrick*, 295 F.3d at 736.  Having considered the testimony adduced from the witnesses and the standard for analysis of that testimony, the court finds that Nelson did not prove by a preponderance of the evidence that Zarling had the intent to defraud when he failed to disclose Gary's contributions as income and described the Settlement Funds transfer as going to George Zarling instead of to Gary.

In light of this conclusion, the court need not consider whether these two misstatements were material.  For all these reasons, the court finds Nelson has not established by a

preponderance of the evidence that Zarling's discharge should be denied under § 727(a)(4).

Judgment will be entered for Zarling on this count.

### IV.    CONCLUSION

For all the reasons stated above, the court will enter judgment for Nelson on the count

brought under §§ 727(a)(2) and will enter judgment for Zarling on the counts brought under §

727(a)(3) and (a)(4).  Zarling's discharge will be denied.

Date:          June 4, 2021

_____
DAVID D. CLEARY
United States Bankruptcy Judge

26